IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:23-cr-20194-MSN |
| ) | |
| MYSHUN JEFFERSON, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Before the Court is Defendant Myshun Jefferson's Motion to Suppress, filed November 13, 2023. (ECF No. 21.) District Judge Mark S. Norris referred the motion to the undersigned for report and recommendation the same day. (ECF No. 22.) The United States responded in opposition on December 10, 2023. (ECF No. 28.) The Court held a hearing on December 19, 2023.[1] (ECF No. 29.) Based on the statements of counsel and the entire record in this case, the Court recommends that the motion be denied.

PROPOSED FINDINGS OF FACT

On June 10, 2023, Detective John White applied for a warrant to search the premises at 2846 Baywood, Memphis, Tennessee 38134, by completing and executing, under oath, an affidavit for a search warrant. (ECF No. 21-1.) As grounds for issuance of the search warrant, Detective White first provided his experience, stating that he has been an officer with the City of

---

[1] The hearing was limited to oral argument, with no evidence submitted.

Bartlett Police Department since January 2002 and has been exclusively assigned to the Narcotics Unit since March 2022. (*Id.* ¶ 1.)

Detective White then provided general information about drug investigations, based on his "training, experience, and participation in the investigation of organizations and individuals involved in the distribution of controlled substances." (*Id.* ¶ 2.) He stated that drug trafficking generates large amounts of cash, which traffickers maintain "on hand in order to finance their on-going drug trafficking business." (*Id.* ¶¶ 2(a), (b).) Traffickers also have "books, receipts, note ledgers, airline tickets, money orders, rental car records and other documents related to the transportation and distribution of controlled substances," including those stored on electronic devices, which they "maintain[] where the traffickers have ready access to them." (*Id.* ¶¶ 2(c), (d).) Traffickers typically also possess firearms and other dangerous weapons. (*Id.* ¶ 2(f).) Traffickers customarily have drugs, paraphernalia, and proceeds in their vehicles, and they "often use a secondary address, separate from their primary residence," to sell and store drugs. (*Id.* ¶¶ 2(h), (i).) Traffickers enlist the help of associates to "maintain these secondary addresses and collectively further the trafficker's criminal enterprise." (*Id.* ¶ 2(i).)

Detective White then described the investigation at issue. He stated that, in May 2023, investigators in the Narcotics Unit met with a confidential source ("CS"), who told them that Jefferson is a local supplier of fentanyl and can supply felony amounts on request. (*Id.* ¶ 4.) The CS said that Jefferson sold fentanyl out of 2846 Baywood and 3176 Powell Street, both in Memphis. (*Id.*) The transactions typically took place outside of the residences after being set up via telephone, but the CS had also participated in transactions inside both residences at least once, "where they observed large amounts of various narcotics." (*Id.*)

The day after this meeting, the investigators directed the CS to set up a controlled purchase from Jefferson. (*Id.* ¶ 5.) The CS called Jefferson and asked to buy fentanyl, and Jefferson agreed. (*Id.*) The transaction occurred that day at the Baywood residence, where Jefferson provided 7.2 grams of fentanyl to the CS for $400, all monitored by the investigators. (*Id.*)

Within five days before June 10, 2023, investigators directed the CS to set up another controlled purchase from Jefferson. (*Id.* ¶ 6.) The CS again called Jefferson, asking to buy fentanyl. (*Id.*) Jefferson agreed and directed the CS to go to the Powell residence. (*Id.*) The CS knew the Powell residence, having purchased fentanyl from Jefferson at that location numerous times in the past, and knew the address to be 3176 Powell. (*Id.*) The transaction occurred that day at the Powell residence, where an unknown third party provided 7.1 grams of fentanyl to the CS for $400, in a transaction that "was facilitated by Jefferson using his phone." (*Id.*)

Finally, Detective White indicated that investigators had conducted surveillance at the Baywood residence over several unspecified days. (*Id.* ¶ 7.) They saw "several transactions in which vehicles pulled on the street in front of the house and different males exited the house and met with the occupants of the vehicles consistent with the way [the CS] described their encounters with Jefferson as well as the two controlled purchases conducted by [the CS] and monitored by investigators." (*Id.*) They also saw a man who looked like Jefferson leave the residence with other men in the early morning and return throughout the day, all in an orange Dodge Challenger that had been parked at the residence during the first controlled purchase. (*Id.*)

Based on the affidavit, a Shelby County Judicial Commissioner found probable cause that "fentanyl, other illegal controlled substances, drug paraphernalia, any device capable of storing

electronic records, records and proceeds from the sale of illegal drugs," and other evidence of drug trafficking would be found at the Baywood residence and issued a warrant to search the residence, as well as any vehicles and outbuildings associated with it. (*Id.* at 1.) The Judicial Commissioner signed the search warrant on June 10, 2023. Investigators executed the search warrant on June 12, 2023. (ECF No. 28, at 3.) They recovered four firearms, various ammunition, over 500 grams of fentanyl, and fifty-six alprazolam tablets. (*Id.* at 4.)

On September 19, 2023, a federal grand jury returned an indictment charging Jefferson with one count of knowingly possessing fentanyl with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and one count of knowingly possessing a firearm in furtherance of that drug trafficking crime in violation of 18 U.S.C. § 924(c).

## **PROPOSED CONCLUSIONS OF LAW**

Jefferson seeks suppression of the fruits of an illegal search unsupported by probable cause. Jefferson bears the burden of proof. *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979))). He argues that the search warrant was not supported by probable cause and alternatively that the good faith exception is inapplicable.[2]

---

[2] In its response, the United States raised the potential issue of Jefferson's standing to challenge the search of the Baywood residence. (ECF No. 28, at 5.) At the hearing, counsel for Jefferson confirmed that the Baywood residence was Jefferson's home and thus that standing is not an issue in this case.

4

I.      **Probable Cause**

Jefferson maintains that the affidavit offered in support of the search warrant fails to present probable cause to search the Baywood residence. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "In reviewing the sufficiency of the evidence supporting probable cause, we are limited to examining the information contained within the four corners of the affidavit. Nevertheless, when considering that information, we look to the totality of the circumstances." *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005); *Illinois v. Gates*, 462 U.S. 213, 230 (1983)); *see also United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) ("Search warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny." (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004))).

"'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion,' and is found to exist when there is 'a "fair probability" that evidence of a crime will be located on the premises of the proposed search.'" *Jackson*, 470 F.3d at 306 (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990); *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). "There must, in other words, be a nexus between the place to be searched and the evidence sought." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)). The reviewer of a search warrant application is "to make a practical, common-sense decision," based on "all the circumstances set forth in the affidavit." *Id.* (quoting *Gates*, 462 U.S. at 238).

"The standard of review for determining the sufficiency of the affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *Rodriguez-Suazo*, 346 F.3d at (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)). "[T]he magistrate's probable cause determination should be afforded great deference." *Id.* (quoting *Davidson*, 936 F.2d at 859). That "deferential review is consistent with 'the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.'" *Id.* (quoting *Gates*, 462 U.S. at 236).

Jefferson argues that the affidavit is unsupported by probable cause because it (A) does not provide a sufficient nexus and (B) contains stale information.

A.    <u>Nexus</u>

Jefferson first argues that the affidavit does not establish a sufficient nexus between the Baywood residence and the alleged criminal activity. To establish a nexus, the affidavit must provide "reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *United States v. Grant*, No. 21-3686, 2023 WL 119399, at *2 (6th Cir. Jan. 6, 2023) (quoting *Frazier*, 423 F.3d at 532). "This connection between the location and the evidence of criminal activity must be 'specific and concrete, not vague or generalized.'" *Id.* (quoting *Brown*, 828 F.3d at 382) (internal quotations omitted).

Jefferson argues that his status as an alleged drug dealer, standing alone, is not enough nexus to justify a search of his home. (ECF No. 21, at 5.) The Sixth Circuit has acknowledged its "struggle[]" in deciding when evidence that an individual is selling drugs creates probable cause to search that individual's home. *United States v. Reed*, 993 F.3d 441, 444 (6th Cir. 2021) (quoting *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018)). The difficulty arises from two competing principles: "[o]n the one hand, probable cause to arrest a suspect does not

necessarily establish probable cause to search the suspect's home," especially due to the Fourth Amendment's treatment of "the home as 'first among equals,'" entitled to "'core' protection." *Id.* at 447 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). "On the other hand, . . . many courts have acknowledged as a common-sense matter that a suspect's home often will be a likely place that the suspect has kept evidence of a crime." *Id.* (citing *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008)).

The Sixth Circuit has "reconciled our caselaw in fact-specific ways." *Id.* at 448. However, "[w]ith categorical statements pointing in opposite directions," precedent demonstrates "the difficulty of providing 'guidance for such a fact-bound legal determination,'" particularly regarding drug trafficking cases. *Id.* (quoting *Brown*, 828 F.3d at 382; comparing, e.g., *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (finding that, "in the case of drug dealers, evidence is likely to be found where the dealers live," and thus "courts generally may find a nexus to search a drug dealer's home even when there is absolutely no indication of any wrongdoing occurring there") (internal quotations omitted), with, e.g., *Brown*, 828 F.3d at 383 (rejecting "the proposition that the defendant's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home")).

Jefferson identifies "[o]nly two pieces of information in the affidavit" as possibly connecting the alleged drug trafficking to the Baywood residence. (ECF No. 21, at 5.) First, he cites "the affiant's knowledge and experience regarding drug dealers keeping evidence of their crime at their homes."[3] (*Id.*) Jefferson is correct that such information, standing alone, is not sufficient to establish a nexus. *See United States v. Edwards*, No. 2:22-cr-20105-MSN, 2023

---

[3] Contrary to this description by Jefferson, the affidavit actually sets out the affiant's knowledge and experience, as relevant here, that drug dealers keep evidence of their crimes "on hand" and "where the traffickers have ready access to them." (ECF No. 21-1 ¶ 2.)

7

WL 6588631, at *5 (W.D. Tenn. July 12, 2023), *report and recommendation adopted*, 2023 WL 6367700 (W.D. Tenn. Sept. 29, 2023) (citing *United States v. Fitzgerald*, 754 F. App'x 351, 361 (6th Cir. 2018)).

Second, Jefferson acknowledges the indications that he was engaged in ongoing drug activity. (ECF No. 21, at 5.) Such activity may be sufficient to create the requisite nexus. *See Edwards*, 2023 WL 6588631, at *5 ("It is 'well established that a nexus to search the home can exist if a suspect's drug dealing is ongoing at the time the police seek the warrant.'" (quoting *Reed*, 993 F.3d at 448)). "But it is yet unsettled how much additional evidence of drug activity is needed for a nexus to exist." *Id.* at *6 (quoting *Grant*, 2023 WL 119399, at *3) (recognizing cases finding a nexus where there is "overwhelming evidence that the defendants [are] major players in a large, ongoing drug trafficking operation" and where there is "recent, reliable evidence of drug activity" (citations omitted)).

Jefferson argues the affidavit supplies evidence of neither his status as a major drug dealer nor his participation in recent drug activity. His analysis, however, ignores or downplays substantial information in the affidavit that links the Baywood residence to drug trafficking. First, the affidavit details the initial controlled purchase, in which the CS purchased fentanyl from Jefferson at the Baywood residence. That direct information regarding drug trafficking at the Baywood residence is sufficient to establish a nexus to search the residence (and, as discussed below, was not stale). *See, e.g.*, *Fitzgerald*, 754 F. App'x at 359 ("Controlled buys of drugs at a defendant's residence have been especially critical in establishing a sufficient nexus between the residence and evidence sought by law enforcement.") (citations omitted).

Second, the affidavit describes the investigators' surveillance of interactions at the Baywood residence in which a car would pull up in front of the house and someone would come

8

out of the house to meet with the people in the car, consistent with the CS's prior drug transactions at the Baywood and Powell residences (both as described by the CS and as observed by the investigators during the controlled purchase). That information is also indicative of ongoing drug trafficking at the Baywood residence, regardless of whether Jefferson himself was involved in the interactions. *See, e.g.*, *United States v. Pointer*, No. 22-1082, 2022 WL 17820539, at *5 n.2 (6th Cir. Dec. 20, 2022) ("[A]ny criminal activity linked to the apartment may support a determination of probable cause to search it, as the requisite nexus is merely between the activity and the location, not the defendant and the activity/location.").

Third, Jefferson disregards the information provided by the CS, arguing that the CS's reliability was not established in the affidavit. "When an affidavit relies on information from a confidential source . . . , examining the totality of the circumstances includes examining the 'veracity, reliability, and basis of knowledge' of the source." *United States v. Helton*, 35 F.4th 511, 518 (6th Cir. 2022) (quoting *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018)). "The veracity, reliability, and basis of knowledge of a source 'are not separate and independent requirements to be rigidly exacted in every case.'" *Id.* (quoting *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (internal quotations omitted)). Information from a confidential source can support a finding of probable cause where the affidavit contains "facts supporting an independent judicial determination that the informant is reliable," such as corroboration of the source's information or an attestation that the source had "provided reliable information in the past." *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005) (citing *United States v. Allen*, 211 F.3d 970, 975–76 (6th Cir. 2000)).

Jefferson is correct that the affidavit does not contain an attestation of reliability, but it does demonstrate corroboration. The CS told investigators that Jefferson supplied felony

9

amounts of fentanyl on request out of the Baywood and Powell residences and that they had seen narcotics inside both residences. Investigators were able to corroborate that information by setting up two controlled purchases by the CS, one from Jefferson at the Baywood residence and one from someone else and facilitated by Jefferson at the Powell residence, both involving felony amounts of fentanyl in response to a same-day request. Furthermore, when Jefferson directed the CS to the Powell location for the second purchase, the CS was able to provide the address of that residence, corroborating his statements about prior drug purchases there. In addition, the investigators' surveillance of the Baywood residence revealed that interactions were occurring between people coming out of the house and people driving up in cars "consistent with the way [the CS] described their encounters with Jefferson." (ECF No. 21-1 ¶ 7.) This corroboration of the information provided by the CS is sufficient to establish the source's reliability. *See, e.g.*, *United States v. Howard*, 632 F. App'x 795, 805 (6th Cir. 2015) ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing 'a substantial basis for crediting the [informant's] hearsay.'" (quoting *Gates*, 462 U.S. at 244–45)).

Because the affidavit demonstrates the CS's reliability, the information provided by the CS is significant in the nexus analysis. The CS's statements that Jefferson sold fentanyl out of the Baywood residence and that the CS saw large amounts of various narcotics in the Baywood residence provide direct links between the alleged drug activity and the Baywood residence. That information thus helps to establish ongoing drug activity at the Baywood residence.

In short, the connection between the Baywood residence and drug trafficking is not based solely on Jefferson's alleged status as a drug dealer. It is also based on the drug transaction in May 2023 that took place at the residence, the CS's information about prior drug transactions at

the residence and seeing large amounts of drugs inside the residence, the investigators' observation of interactions consistent with drug transactions outside of the residence, and the affiant's knowledge and experience that drug dealers keep evidence of their crimes close at hand. The totality of this information provides a sufficient nexus to support probable cause.

  B.  Staleness

Jefferson argues that the information provided about the first controlled purchase in May 2023, a maximum of forty days before the warrant was issued,[4] was stale. "[S]tale information cannot be used in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377–78 (6th Cir. 2009) (citing *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). "The expiration of probable cause is determined by the circumstances of each case and depends on the inherent nature of the crime." *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) (citing *Sgro v. United States*, 187 U.S. 206, 210–11) (1932); *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)).

> Relevant variables include "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?)[, and] the place to be searched (mere criminal forum of convenience or secure operational base?)."

*Id.* (quoting *Spikes*, 158 F.3d at 923).

Jefferson relies primarily on *Hython*, which analyzes staleness in the context of a drug warrant executed at a residence. As held by the Sixth Circuit,

> The crime at issue in this case—the sale of drugs out of a residence—is not inherently ongoing. Rather, it exists upon a continuum ranging from an individual who effectuates the occasional sale from his or her personal holdings of drugs to known acquaintances, to an organized group operating an established and notorious drug den. The inclusion of outdated information has been insufficient

---

[4] If the investigators' first meeting with the CS occurred as early as May 1, 2023, then the first controlled purchase occurred on May 2, 2023. The warrant was issued on June 10, 2023.

11

> to render an entire affidavit stale when the affidavit as a whole establishes that the criminal activity in question is ongoing and continuous, or closer to the "drug den" end of the continuum.

*Id.* at 485.  Jefferson argues that his alleged participation in a single controlled purchase in May 2023 renders his case closer to the "personal holdings" end of the spectrum.  (ECF No. 21, at 9.)  Again, however, Jefferson ignores the other information in the affidavit—the second controlled purchase in June 2023 at the Powell residence that Jefferson facilitated on a same-day request, the "several days" of surveillance of multiple interactions consistent with drug trafficking at the Baywood residence,[5] and the corroborated information from the CS that Jefferson sold fentanyl out of the Baywood residence.  This information in the affidavit regarding ongoing drug sales places Jefferson's case much closer to the "drug den" end of the spectrum.  *See Hython*, 442 F.3d at 485 (describing *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001), in which the "number of controlled buys, in combination with ongoing observation of the comings and goings at the residence, established probable cause to believe that the residence continued to be an operational base for a drug ring").  As such, even if the passage of, at most, forty days could be said to render the information about the first controlled purchase outdated, the inclusion of that information does not make the affidavit stale.  *See, e.g.*, *Pointer*, 2022 WL 17820539, at *7 (finding controlled purchases that occurred within a year of execution of the search warrant, "with the latest occurring only two months beforehand," to be "not particularly remote" in light of information of an ongoing drug operation).

In addition, the second controlled purchase, which occurred no more than five days before the search warrant was issued, refreshes the older information.  *See id.* ("Where recent

---

[5] The affidavit does not specify the dates of this surveillance, but based on the indication in the affidavit that the CS told the investigators about Jefferson on or after May 1, 2023, the most reasonable inference is that the surveillance started on or after that date.

information corroborates otherwise stale information, probable cause may be found." (quoting *Henson*, 848 F.2d at 1381–82); *id.* (citing *Spikes*, 158 F.3d at 924, for the proposition that, "even assuming the information in the affidavit was in some respects 'stale,' the more recent events related therein refreshed this otherwise stale information"). That the second purchase occurred at the Powell residence does not impact the analysis, as "the location of drug activity does not change its suggestiveness of an ongoing conspiracy, which is the key question in the staleness inquiry." *Id.* at *7 n.5.

Analysis of the *Spikes* factors likewise support this conclusion. The facts in the affidavit, discussed more fully above, show that the first, third, and fourth factors favor the United States. As to the character of the crime, the affidavit demonstrates that the alleged crime is an ongoing drug trafficking operation, not a chance encounter. As to the itinerant nature of the defendant, Jefferson appears to have been fairly entrenched in his operations at the two locations, as confirmed by the CS's statements about multiple transactions at those locations and the investigators' surveillance of him at the Baywood residence on multiple occasions. As to the place to be searched, the Baywood residence was Jefferson's home, not a mere forum of convenience.

As to the third factor, whether the items to be seized are easily transferrable or of enduring utility to the holder, Jefferson stresses the nature of drug trafficking operations, in which drugs and cash are quickly and readily transferred. Jefferson also notes that, in the second controlled purchase, Jefferson directed the CS to the Powell residence, implying that the fentanyl requested was no longer at the Baywood residence. Jefferson submits that this information demonstrates the staleness of the first controlled purchase and undercuts a reasonable belief that drugs would be found at the Baywood residence. However, as noted by the United States, the

investigators executing the search warrant were not looking for drugs or cash alone—they also sought electronic devices and records, which the affiant attested contain information about drug trafficking and are commonly kept where drug traffickers have ready access to them. Such items—for example, computers and mobile telephones—are not perishable or readily transferred and are instead likely to be maintained by a drug trafficker at his residence. This factor thus weighs against a finding of staleness as well.

The affidavit establishes that the first controlled purchase at the Baywood residence was not remote and was linked to an ongoing drug trafficking operation. The first purchase was thus not stale information and was properly considered in the probable cause determination.

In light of the foregoing, the affidavit establishes probable cause to believe that evidence of drug trafficking would be found at the Baywood residence. It is therefore recommended that the motion to suppress be denied.

## II.     Good Faith

Even if the affidavit is unsupported by probable cause, the good-faith exception precludes application of the exclusionary rule. Under that exception, "even if the search warrant were found to be fatally defective, the evidence would not be suppressed 'if the seizure was based on reasonable, good faith reliance on the warrant.'" *United States v. Hill*, 27 F.4th 1155, 1192 (6th Cir. 2022) (quoting *United States v. Abboud*, 438 F.3d 554, 578 (6th Cir. 2006)). "The 'good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)). "[T]he burden rests on the government to prove that [the executing officer's] reliance on a warrant was

objectively reasonable." *United States v. Linares*, No. 13-20368, 2015 WL 3870959, at *9 (E.D. Mich. May 4, 2015) (quoting *United States v. Rissew*, 580 F. App'x 35, 36 (2d Cir. 2014)).

The "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing, e.g., *Herring v. United States*, 555 U.S. 135, 141 (2009)). Its operation is thus limited "to situations in which this purpose is 'thought most efficaciously served.' Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974); *United States v. Janis*, 428 U.S. 433, 454 (1976)). In addition to deterrence, "[t]he analysis must also account for the 'substantial social costs' generated by the rule," which "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* (quoting *Leon*, 468 U.S. at 907). Thus, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* (citing *Herring*, 555 U.S. at 141; *Leon*, 468 U.S. 910).

That "cost-benefit analysis" focuses on "the 'flagrancy of the police misconduct' at issue." *Id.* at 238 (quoting *Leon*, 468 U.S. at 909). "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144). "But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, . . . the 'deterrence rationale loses much of its force' . . . ." *Id.* (quoting *Leon*, 468 U.S. at 919). A warrant "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"—a "bare bones affidavit"—"shows that the officer recklessly relied on the judge's decision that probable cause existed for the warrant." *Reed*, 993

15

F.3d at 450 (quoting *Leon*, 468 U.S. at 923; *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017)).

As relevant in this case, "[f]or an officer's reliance to have been reasonable, the application must have provided 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018) (quoting *Brown*, 828 F.3d at 385). A "substantial basis" for that nexus is not required, "only 'some connection, regardless of how remote it may have been—some modicum of evidence, however slight.'" *Id.* (quoting *White*, 874 F.3d at 497). "[A] link between the drug dealer's activities and his home that would be insufficient to establish probable cause may suffice to establish good-faith reliance on the warrant." *Id.* at 417 (citing *Frazier*, 423 F.3d at 537); *see also Reed*, 993 F.3d at 450 ("There obviously 'must be daylight' between the two standards because *Leon*'s exception applies only when an affidavit falls short of probable cause." (quoting *White*, 874 F.3d at 497)). However, the affidavit must still "present some 'particularized facts that indicate veracity, reliability, and basis of knowledge and go beyond bare conclusions and suppositions.'" *McCoy*, 905 F.3d at 416 (citing *United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006)).

The affidavit in this case provides particularized facts that present a reasonable basis for believing that evidence of drug trafficking would be found in the Baywood residence. The affiant attested that a CS told investigators that Jefferson supplied felony quantities of fentanyl on request out of the Baywood residence and elsewhere. That information was corroborated by two controlled purchases, one in May at the Baywood residence and one in June at the Powell residence, in which Jefferson sold or facilitated the sale of felony amounts of fentanyl to the CS upon a same-day request. The investigators also surveilled the Baywood residence on several

days and observed several interactions similar to the controlled purchases by the CS that they had monitored.  The totality of that information, combined with the affiant's knowledge and experience that drug traffickers keep the evidence and tools of their crimes close at hand, establishes a reasonable basis to believe the Baywood residence contained evidence of drug trafficking.

When considering the affidavit as a whole, it is not bare bones or so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, such that the officers were reckless in relying on its issuance.  *See United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc) ("We reserve [the bare bones] label for an affidavit that merely 'states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" (quoting *United States v. Washington*, 380 F.3d 236, 241 n.4 (6th Cir. 2004))).  The affidavit set forth sufficient indicia of probable cause to give the investigators an objectively reasonable basis to rely on issuance of the warrant in conducting the search of the Baywood residence.  Because the investigators acted in good faith, suppression is unwarranted.

## RECOMMENDATION

For the foregoing reasons, this Court recommends that the motion to suppress be denied.

Respectfully submitted this 28th day of December, 2023.

                                                    s/Annie T. Christoff
                                                    ANNIE T. CHRISTOFF
                                                    UNITED STATES MAGISTRATE JUDGE

## NOTICE

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.